**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | 2:23-cr-180-2-NR |
| | ) | |
| BABANGIDA ADAM, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM ORDER

A federal grand jury indicted Defendant Babangida Adam with conspiring to possess with intent to distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, possession with intent to distribute 40 grams or more of fentanyl, and possession of a firearm in furtherance of a drug-trafficking crime. The FBI seized evidence of these crimes (drugs, a firearm, several cellphones, and a silver scale) from Mr. Adam's residence at 1810 W. Railroad Street, Carnegie, PA 15106 during a search pursuant to a warrant. According to Mr. Adam, the warrant lacked sufficient evidence to form probable cause. As such, he now moves to suppress all the evidence obtained from his residence.

After careful consideration, the Court finds that the warrant and incorporated affidavit establish probable cause, and therefore denies Mr. Adam's motion.

## BACKGROUND

On August 15, 2023, a federal grand jury indicted Mr. Adam for violations of 21 U.S.C. § 846, 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(vi), and 18 U.S.C. § 924(c)(1)(A)(i)—all related to a conspiracy to distribute fentanyl. ECF 33. The FBI seized evidence related to the charged offenses from Mr. Adam's home pursuant to a federal search warrant. The affidavit supporting the warrant sets forth the facts as follows.

A reliable confidential source told the FBI that Mr. Adam used the phone number 412-652-3434, distributed heroin/fentanyl, drove a blue/purple Dodge

Charger, and resided in Carnegie, PA.  ECF 333, ¶ 19a.  The FBI corroborated this information through various investigative techniques, included a controlled purchase of narcotics.  *Id.*  Mr. Adam listed the Carnegie residence as his residence address on his driver's license.  *Id.*, ¶ 15.  The Allegheny County tax assessment website identifies an individual with the same last name as Mr. Adam as the owner of the Carnegie residence; due to the same last name, the FBI believed that the listed owner was Mr. Adam's relative.  *Id.*, p. 7 n.1.

During the second week of March, 2023, the FBI used the confidential source to make a controlled purchase of drugs from Mr. Adam.  *Id.*, ¶¶ 21-22.  During this controlled buy, the confidential source called Mr. Adam and requested "2 buns" which agents present knew to mean two bundles of heroin/fentanyl.  *Id.*, ¶ 21.  Mr. Adam responded that he was in Carnegie, and indicated that he wanted the confidential source to meet him in the Carnegie area.  *Id.*

Agents set up surveillance in the area where the controlled buy was anticipated to occur.  *Id.*, ¶ 24.  The agents watched the confidential source arrive at the meeting location and conduct the transaction.  *Id.*  The agents positively identified Mr. Adam as the other participant in the transaction.  *Id.*  After the transaction, agents confirmed that the confidential source had received two bundles of heroin/fentanyl.  *Id.*, ¶ 25.  Surveillance after the transaction confirmed that Mr. Adam returned to the Carnegie residence.  *Id.*, ¶ 27.

The affidavit also contains information about two other drug transactions between Mr. Adam and his co-defendant, Austin Coburn.  On April 4, 2023, investigators stopped Mr. Coburn (along with his associates) after Mr. Coburn met with Mr. Adam at 2923 Penn Ave., Pittsburgh, PA.  *Id.*, p. 14 n.7.  During this traffic stop, agents recovered approximately 14 bricks of fentanyl from Mr. Coburn and his associates.  *Id.*  The FBI also intercepted communications between Mr. Adam and Mr. Coburn pursuant to Title III wiretaps.  On April 9, 2023, Mr. Coburn called Mr. Adam

several times. *Id.*, ¶¶ 29, 31, 33. The agent stated he understood the conversation in the first phone call as Mr. Coburn requesting twelve bricks of fentanyl. *Id.*, ¶ 30.

In a subsequent phone call, Mr. Adam indicated that he was "about to leave [his] crib" and would meet Mr. Coburn in 10-15 minutes. *Id.*, ¶¶ 33-34. Critically, geolocation ping data for this telephone call placed the location of Mr. Adam's telephone in the area of the Carnegie residence. *Id.*, p. 15 n.8.

Agents set up surveillance at the suspected meeting location (2923 Penn Ave., Pittsburgh, PA) and observed Mr. Adam arrive, Mr. Coburn entering the passenger seat of Mr. Adam's vehicle, and then Mr. Coburn exiting Mr. Adam's vehicle, entering another vehicle, and leaving the meeting location. *Id.*, ¶ 35.

Additionally, according to the affidavit, at the time the warrant was sought, Mr. Adam had previously been arrested for drug trafficking. *Id.*, ¶ 14.

Based on the above information, the FBI applied for and was granted a search warrant by a U.S. magistrate judge for the Carnegie residence to search for, among other things, suspected controlled substances, firearms, and cell phones and electronic devices. ECF 333. Pursuant to that warrant, the FBI searched the Carnegie residence on April 20, 2023, and seized "a quantity of narcotics, United States Currency, one 9 mm. Glock 17 firearm serial number MGR571, one magazine with ammunition, one red iPhone, one black Samsung Galaxy S7, one black iPhone with a purple case, one rose gold iPhone, and one silver scale." ECF 332, p. 4.

Mr. Adam seeks suppression of all evidence seized from the Carnegie residence on April 20, 2023. ECF 331.

## DISCUSSION & ANALYSIS

Mr. Adam argues that the warrant authorizing the search of his residence lacked probable cause. He makes essentially one main argument—that there was insufficient information in the warrant application to connect any drugs with the

residence.  After reviewing the warrant and affidavit, the Court disagrees.  There is ample probable cause establishing a nexus between drugs and the residence.

The Court begins with the appropriate standard of review and legal standards.  "[A] reviewing court may not conduct a de novo review of the magistrate judge's determination of probable cause."  *United States v. Whitner*, 219 F.3d 289, 296 (3d Cir. 2000).  Instead, the "reviewing court must determine only that the magistrate judge had a substantial basis for concluding that probable cause existed to uphold the warrant."  *Id.* (cleaned up).  Reviewing courts should give a magistrate judge's finding of probable cause "great deference."  *Illinois v. Gates*, 462 U.S. 213, 236 (1983).  "A magistrate judge may find probable cause when, viewing the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *United States v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001) (cleaned up).

The Fourth Amendment protects "[t]he right of the people to be secure . . . against unreasonable searches and seizures."  U.S. Const. Amend. IV.  "[T]he Fourth Amendment precludes the search of a home lacking a 'nexus' to the alleged crimes[.]"  *United States v. Stearn*, 597 F.3d 540, 558 (3d Cir. 2010).

Direct evidence linking the place to be searched with the crime is not required—the magistrate judge is permitted to make reasonable inferences by "considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide stolen property."  *United States v. Jones*, 994 F.2d 1051, 1056 (3d Cir. 1993) (cleaned up).  Supporting affidavits "must be read in [their] entirety and in a common sense and nontechnical manner."  *United States v. Conley*, 4 F.3d 1200, 1206 (3d Cir. 1993).  The resolution of difficult cases "should be largely determined by the preference to be accorded to warrants."  *United States v. Ventresca*, 380 U.S. 102, 109 (1965).

If an individual is involved in drug distribution, evidence of his or her involvement "is likely to be found where the dealers reside." *Whitner*, 219 F.3d at 297. This is true even if no drug trafficking is observed at the residence. *United States v. Feliz*, 182 F.3d 82, 87 (1st Cir. 1999) (rejecting defendant's argument that a warrant was not supported by probable cause when no drug trafficking was observed at his residence) *cert. denied*, 528 U.S. 1119 (2000). "It is reasonable to infer that a person involved in drug dealing . . . would store evidence of that dealing at his home." *Hodge*, 246 F.3d at 306.

In this regard, the Third Circuit has established a test for district courts to assess the reasonableness of such an inference—the so-called *Burton* standard. The "application of this inference is based on evidence supporting three preliminary premises: (1) that the person suspected of drug dealing is actually a drug dealer; (2) that the place to be searched is possessed by, or the domicile of, the dealer; and (3) that the home contains contraband linking it to the dealer's drug activities." *United States v. Burton*, 288 F.3d 91, 104 (3d Cir. 2002).

Applying these three prongs, the Court finds that the affidavit supporting the search warrant here established the requisite nexus between the evidence sought and Mr. Adam's home.

***First, the affidavit contains sufficient evidence to show that Mr. Adam is a drug dealer.*** A reliable confidential source told the FBI that Mr. Adam distributed heroin/fentanyl. ECF 333, ¶ 19a. Investigators observed three drug transactions involving Mr. Adam: the controlled buy with the confidential source, and the April 4, 2023, and April 9, 2023, transactions between Mr. Adam and Mr. Coburn. *Id.*, ¶¶ 21-22, 29-30, 33-35, p. 14 n.7. Additionally, according to the affidavit, at the time the warrant was sought, Mr. Adam had previously been arrested for drug trafficking. *Id.*, ¶ 14. An informant's tip that a defendant is a drug dealer and law enforcement's observation of the defendant's participation in drug transactions

through controlled buys is "powerful evidence" that the defendant is a drug dealer. *Stearn*, 597 F.3d at 563 (finding the first *Burton* prong satisfied because an informant told law enforcement that the defendant was a drug dealer and law enforcement observed a controlled buy). The Court finds that this is enough evidence to satisfy the first *Burton* prong.

*Second, the affidavit contains sufficient evidence to show that the Carnegie residence is Mr. Adam's domicile.* A reliable confidential source told the FBI that Mr. Adam resides in Carnegie, PA. ECF 333, ¶ 19a. The FBI corroborated this information through various investigative techniques. *Id.* Mr. Adam listed the Carnegie residence as his residence address on his driver's license. *Id.*, ¶ 15. Information from the Allegheny County tax assessment website identifies an individual with the same last name as Mr. Adam as the owner of the Carnegie residence, and the FBI reasonably believed that individual was Mr. Adam's relative. *Id.*, p. 7 n.1. In the lead-up to the controlled buy, Mr. Adam told the confidential source that he was in Carnegie, and indicated that he wanted the confidential source to meet him in the Carnegie area. *Id.*, ¶ 21. Surveillance that occurred after the controlled buy established that Mr. Adam returned to the Carnegie residence. *Id.*, ¶ 27. The affidavit contains "ample evidence" that the Carnegie residence was Mr. Adam's domicile, and satisfies the second *Burton* prong. *Stearn*, 597 F.3d at 563 (finding second *Burton* prong satisfied because an informant's tip indicated that the defendant lived at the residence, a relative of the defendant owned the residence, and law enforcement observed the defendant enter the residence).

*Third, the affidavit contains sufficient evidence to show that the Carnegie residence contained contraband and was linked to Mr. Adam's drug activity.* Factors that can establish the required nexus between an individual's drug-dealing activities and his home include: "large-scale operations . . . the conclusions of experienced officers regarding where evidence of a crime is likely to be

found, the proximity of the defendant's residence to the location of criminal activity, probable cause to arrest the defendant on drug-related charges, and the tip of a concerned citizen that a specific stolen item would be found in the defendant's residence." *Stearn*, 597 F.3d at 559-60 (cleaned up).

The affidavit includes the following facts that establish a nexus between Mr. Adam's drug-dealing activities and the Carnegie residence: (1) the confidential source told law enforcement that Mr. Adam lived in Carnegie and dealt drugs in the Carnegie neighborhood; (2) leading up to the controlled buy, Mr. Adam told the confidential source that he was in Carnegie; (3) the controlled buy took place in Carnegie; and (4) agents conducting surveillance during the controlled buy observed Mr. Adam travel back to the Carnegie residence after the transaction with the confidential informant.  ECF 333, ¶¶ 20-21, 24, 27.

Perhaps most importantly, the affidavit states that geolocation ping data for a telephone call between Mr. Adam and Mr. Coburn related to a drug transaction placed the location of Mr. Adam's telephone in the area of the Carnegie residence. *Id.*, p. 15 n.8.  This is significant because, as the timeline in the affidavit establishes, this firmly connects Mr. Adam's possession of drugs at the residence to an observed drug transaction:

- On April 9, 2023, at 12:04 p.m., Mr. Adam called Mr. Coburn and said, "I'm about to leave my crib"—which can reasonably be inferred to be the residence.  This was in connection with Mr. Adam's plan to meet up to sell Mr. Coburn controlled substances.  *Id.*, ¶ 33.

- The ping data placed Mr. Adam's call as coming from a location in the area of the residence.  *Id.*, p. 15 n.8.

- About 20 minutes later, agents witnessed what appeared to be a drug transaction between Mr. Adam and Mr. Coburn.  *Id.*, ¶ 35.

Taken together, these inferences reasonably suggest that Mr. Adam possessed the drugs at his residence, drove his car to the meet-up area, sold those drugs to Mr. Coburn.

These facts are more than sufficient to establish a nexus between Mr. Adam's drug-dealing activities and the Carnegie residence. *Stearn*, 597 F.3d at 564 (holding that the affidavit established a nexus between a defendant's drug dealing activity and the defendant's residence because an informant told law enforcement that the defendant sold drugs out of his home and a gym, the defendant slept at the residence after collecting proceeds from a drug sale, indicating that he entered the residence in the possession of drug proceeds, and the drug sales occurred in the same area as the residence).[1] Thus, the evidence in the affidavit is sufficient to satisfy the third *Burton* prong.

In support of his motion to suppress, Mr. Adam makes one additional, related argument. He argues that there was an insufficient nexus between the Carnegie residence and the investigation because of a statement made by the government agent in a separate wiretap application. Specifically, in the wiretap application, the agent stated that law enforcement at that time could not say definitively whether Mr. Adam stored evidence at his residence. ECF 332, p. 6. The wiretap application states that agents believed that Mr. Adam used the residence, but because the discovery of the residence was "somewhat new" the agent could not "meaningfully predict whether [Mr. Adam] store[s] narcotics" in the Carnegie residence. ECF 334, p. 96. This argument fails for two reasons.

---

[1] As further support, the magistrate judge likely relied on the Agent's statements in the affidavit that based on his training, drug dealers are likely to store evidence of their drug-dealing at their home. ECF 333, ¶ 36a.-k., *see United States v. Barnes*, No. 17-171, 2021 WL 6051561, at *11 (W.D. Pa. Dec. 20, 2021) (Hornak, C.J.) (holding that "the magistrate judge was permitted to rely on [the agent's] conclusion that evidence of drug distribution was likely to be found [at the residence]"). This too provides further support for an inference of probable cause.

First, it's not relevant what a separate wiretap application stated.  In assessing probable cause, the magistrate judge here was confined to the warrant and incorporated affidavit.  *Whitner*, 219 F.3d at 296.  Those documents established probable cause, regardless of what any other document not before the magistrate judge might have said.[2]

Second, even if the statements in the wiretap application mattered, there is no real inconsistency between that application and the warrant.  The wiretap application occurred on March 31, 2023, and the warrant application occurred after that, on April 12, 2023.  The earlier wiretap application conceded that there was an insufficient nexus to the residence, but that necessarily was based on information known at that time.  There was clearly more evidence obtained by law enforcement after the wiretap application was granted but before the search warrant was issued.  Indeed, a good deal of the fruit from the wiretap was used in the search-warrant application to establish probable cause, including the connection with the Carnegie residence.  ECF 333, § C.  The Court therefore finds that the statements in the wiretap application do not undermine probable cause in the separately-issued warrant.

Reading the affidavit in its entirety and a common-sense manner, *Conley*, 4 F.3d at 1206, the affidavit satisfies the *Burton* test, and so the Court can reasonably infer a nexus between the drugs and the residence.  Under the totality of the circumstances, the magistrate judge had a substantial basis for concluding that probable cause existed to issue the warrant.  *Whitner*, 219 F.3d at 296.

---

[2] Notably, the wiretap application was made to District Judge Hardy, while the warrant application was made to Magistrate Judge Eddy.  There is nothing suggesting that Magistrate Judge Eddy was provided the wiretap application in connection with the warrant application.

For these reasons, Mr. Adam's motion to suppress fails and must be denied.[3]

\*     \*     \*

**AND NOW**, this **26th day of March, 2024**, it is hereby **ORDERED** that, for the reasons stated above, Mr. Adam's motion to suppress (ECF 331) is **DENIED**.


BY THE COURT

/s/ J. Nicholas Ranjan
United States District Judge

---

[3] Because the Court has determined that the warrant was supported by probable cause, the Court need not address whether the good-faith exception applies.